UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY HEALTH CENTER ALLIANCE FOR PATIENT ACCESS, et al.,<br><br>             Plaintiffs,<br><br>    v.<br><br>MICHELLE BAASS, et al.,<br><br>             Defendants. | No.  2:20-cv-02171-DAD-KJN<br><br><br>ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS<br><br>(Doc. Nos. 61, 66) |

This matter is before the court on two motions to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) filed on behalf of defendants Michelle Baass and Chiquita Brooks-LaSure.  (Doc. Nos. 61, 66.)  The pending motions were taken under submission by the previously assigned district judge.  (Doc. No. 74.)  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 78.)  Although the pending motions had been taken under submission prior to that reassignment, the undersigned scheduled the motions for hearing on June

/////

/////

/////

/////

1

20, 2023.[1]  On that date, attorney Kathryn Doi appeared by video on behalf of plaintiffs, California Deputy Attorney General Joshua Sondheimer appeared by video on behalf of defendant Baass, and Assistant U.S. Attorney Joseph Frueh appeared by video on behalf of defendant Brooks-Lasure.

For the reasons explained below, defendants' motions to dismiss will be granted.

## BACKGROUND

On December 29, 2021, the Centers for Medicare & Medicaid Services ("CMS")—the federal agency within the U.S. Department of Health and Human Services tasked with enforcing the Medicaid Act—approved a proposal from the California Department of Health Care Services ("DHCS") that, among other things, changed the payment mechanism under the California Medicaid program ("Medi-Cal") for Medicaid-covered prescription drugs from a managed-care model to a fee-for-service model.  This transition, called Medi-Cal Rx, was enacted to further California's goal of becoming the single-purchaser of Medi-Cal prescription drugs in order to strengthen the state's bargaining power and make prescriptions drugs generally more affordable.

Plaintiffs—ten community health clinics designated as federally qualified health centers ("FQHC") and a trade association whose affiliate members are all FQHCs[2]—oppose this transition to Medi-Cal Rx.  Plaintiffs have sued defendant Michelle Baass, the director of the

/////

---

[1]  The court notes that on June 16, 2023, plaintiffs filed a "substitution of attorney" stating that attorney Doi's law firm, Feldesman Tucker Leifer Fidell LLP, was being substituted as their counsel in place of her previous law firm,  Hanson Bridgett LLP.  (Doc. No. 90.)  The docket has been updated to reflect attorney Doi's address at her new law firm, but the docket still reflects that both attorney Andrew Stroud (of Hanson Bridgett LLP) and attorney Regina Boyle (of the Law Offices of Regina M. Boyle) are also counsel of record.  Plaintiffs' "substitution of attorney" filing did not have the effect it purported to because "[a]ppearances as an attorney of record shall not be made in the name of a law firm. . . ."  L.R. 182(b).  If plaintiffs intended to have attorney Doi serve solely as counsel of record in this action, then the proper filing must be made showing that the other counsels of record have withdrawn from the case.  *See* L.R. 182(d), (g).

[2]  The eleven plaintiffs are:  Community Health Center Alliance for Patient Access; Avenal Community Health Center; Community Health Centers of the Central Coast; Family Health Centers of San Diego; Imperial Beach Community Clinic; La Maestra Family Clinic; Omni Family Health; Open Door Community Health Centers; Shasta Community Health Center; South County Community Health Center, Inc.; and United Health Centers of San Joaquin Valley, Inc.

DHCS, and defendant Chiquita Brooks-LaSure, the administrator of the CMS, to challenge the approval of and transition to Medi-Cal Rx.[3]

## A.  Statutory and Regulatory Background

"Title XIX of the Social Security Act, referred to as the Medicaid Act, is a cooperative federal-state program through which the federal government provides financial assistance to states so that they can furnish medical care to low-income individuals." *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1010 (9th Cir. 2013). "Medicaid is jointly financed by federal and state governments and administered by the states through state plans approved by the Secretary of Health and Human Services." *Id.* (citing 42 C.F.R. § 430.0.). California participates in Medicaid through Medi-Cal and has designated the DHCS as the state agency responsible for its administration. *Id.* (citing Cal. Welf. & Inst. Code §§ 10740, 14000 *et seq.*).

To receive federal funds for Medi-Cal, the DHCS must submit a state plan that meets federal statutory and regulatory requirements for approval by the Secretary of Health and Human Services. *See* 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10, 430.12, 430.15. A state plan is an agreement between a state and the federal government describing how that state administers its Medicaid program and defining the groups of individuals to be covered, benefits to be provided, methodologies for reimbursing providers, and other administrative requirements that states must meet to participate in Medicaid. *See* 42 U.S.C. §§ 1396a(a)(10), 1396d(a). The Secretary of Health and Human Services has delegated to CMS the responsibility for determining whether a state plan or an amendment to a state plan satisfies federal requirements. *See* 42 C.F.R. § 430.15. States must amend their state plans to reflect "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." *Id.* § 430.12(c)(1)(ii).

___

[3]  When plaintiffs filed their operative first amended complaint ("FAC") on December 30, 2021, defendant DHCS was terminated from this action and defendant Baass (the current DHCS director) was substituted in for defendant William Lightbourne (the previous DHCS director). (Doc. No. 45.) However, the docket in this case was never updated to reflect that the DHCS had been terminated as a defendant, and instead of being substituted in for defendant Lightbourne, defendant Baass was simply added to the docket. (*Compare* Doc. No. 1 *with* Doc. No. 45.) Accordingly, the court will direct the Clerk of the Court to update the docket to reflect that as of December 30, 2021, defendant DHCS was terminated from this action and defendant Lightbourne was replaced by defendant Baass. *See* Fed. R. Civ. Pro. 25(d).

States have two primary models for delivering care to Medicaid beneficiaries:  (i) a fee-for-service ("FFS") model, or (ii) a managed-care model (also referred to as capitation).  *See State v. Rettig*, 987 F.3d 518, 524 (5th Cir. 2021) (citing Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989, 40,989 (June 14, 2002)), *cert. denied sub nom. Texas v. Comm'r of Internal Revenue*, ___ U.S. ___, 142 S. Ct. 1308 (2022).  Under an FFS model, the state reimburses enrolled medical providers—such as FQHCs—directly for covered services a Medicaid beneficiary receives.  *See id.*  Under a managed-care model, the state pays a set amount of funding to a managed-care organization on a monthly basis (i.e., a capitation payment) that is dependent on the number of Medicaid beneficiaries the managed-care organization covers, and then the managed-care organization provides care to those beneficiaries.  *See id.*

In 2011, CMS approved a waiver of certain Medicaid requirements that allowed California to implement the Medi-Cal managed-care system.  (Doc. No. 45 at ¶ 38 (hereinafter, "FAC")).  According to the allegations of the FAC, approximately 83% of Medi-Cal beneficiaries were enrolled with a managed-care organization as of September 2021.  (*Id.* at ¶ 38.)

**B.      Plaintiffs and How They Are Funded**

Plaintiffs are a coalition of non-profit community health centers and medical providers located throughout California.  (*Id.* at ¶ 10.)  Their mission is to provide high-quality and comprehensive health care services, at little or no-cost, to low-income, medically underserved patients who rely on Medi-Cal.  (*Id.*)  Plaintiffs include 501(c)(3) non-profit corporations designated as FQHCs by the federal Health Resources & Services Administration and by CMS under 42 U.S.C. § 1396d(*l*)(2).  (*Id.*)  Plaintiff Community Health Center Alliance for Patient Access is a 501(c)(4) non-profit organization whose affiliate members are all FQHCs.  (*Id.* at ¶ 11.)  FQHCs, such as plaintiffs, are federally subsidized healthcare providers that receive grants under § 330 of the Public Health Service Act, 42 U.S.C. § 254b, for providing services to underserved communities.  *See* 42 U.S.C. § 1396d(*l*)(2)B).  FQHCs also receive funding separate from § 330 grants in connection with services they provide to Medicaid beneficiaries.  *See Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 363 (5th Cir. 2018) ("FQHCs have two sources of compensation:  federal grants under § 330 of the Public Health Service Act [], 42 U.S.C. §

1   254b, for medically underserved communities and state reimbursements for Medicaid services, *id.*

2   § 1396a(bb).”); *see also Arizona All. for Cmty. Health Centers v. Arizona Health Care Cost*

3   *Containment Sys.*, 47 F.4th 992, 996 (9th Cir. 2022) (“FQHCs treat medically underserved areas

4   or populations and are required to meet various eligibility criteria under the Medicaid Act.”).

5        In fact, states participating in the Medicaid program are required to reimburse healthcare

6   services provided by FQHCs to Medicaid patients.  *See* 42 U.S.C. §§ 1396a(a)(15), (bb),

7   1396d(a)(2)(C), (*l*)(2)(B); *see also* Cal. Welf. & Inst. Code § 14132.100(a), (b), & (g).  The

8   federal requirement that FQHCs be paid for Medicaid services rendered have evolved over time.

9   *See Three Lower Cntys. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297–98 (4th Cir.

10  2007) (explaining how FQHCs were reimbursed for services rendered from 1989 through 2000

11  and how an amendment to the Medicaid Act in 2000 implemented a new reimbursement system).

12  Currently, 42 U.S.C. § 1396a(bb) provides that the state is obligated to ensure that FQHCs are

13  reimbursed for covered Medicaid services and sets forth the framework for assessing

14  reimbursement amounts—this framework is known as the Prospective Payment System (“PPS”).

15  *See Legacy Cmty. Health Servs., Inc.*, 881 F.3d at 363.  The PPS rate is the reimbursement

16  amount that FQHCs are entitled to under § 1396a(bb) for their Medicaid services provided.  *See*

17  *id.*; 42 U.S.C. § 1396a(bb)(1).  If a state elects to use managed-care organization to reimburse

18  FQHCs, then the Medicaid Act for the most part leaves the managed-care organizations free to

19  negotiate and contract with FQHCs.[4]  *See Legacy Cmty. Health Servs., Inc.*, 881 F.3d at 363.

20  However, if reimbursement of an FQHC from a managed-care organization falls below the PPS

21  amount, then “§ 1396a(bb) requires the state to ‘provide for payment to the [FQHC] by the State

22  of a supplemental payment equal to the amount (if any)’ of the difference between the [managed-

23  care organization’s] payment and the required PPS amount.”  *Id.* (quoting 42 U.S.C. §

24  1396a(bb)(5)(A)); *see also Three Lower Counties*, 498 F.3d at 299 (“[U]nder this scheme, an

25  ───────────────

26  [4]  The Medicaid Act also contains requirements for managed-care contracts, including that a
    managed-care organization must “‘provide payment that is not less than the level and amount of

27  payment which the [FQHC] would make’ if it were not an FQHC—i.e., the [managed-care
    organization] must pay the FQHC at least competitive market rates.”  *Legacy Cmty. Health*

28  *Servs., Inc.*, 881 F.3d at 363 (quoting 42 U.S.C. § 1396b(m)(2)(A)(ix)).

1   FQHC . . . receives a part of its Medicaid payment from the managed care organization and the

2   balance from [the state] in the form of a supplemental or 'wrap-around' payment.")  Title 42 §

3   1396a(bb)(6) also provides for "[a]lternative payment methodologies."  Under an alternative

4   payment methodology, a state may provide for payment under any kind of mechanism that is both

5   "agreed to by the State and [FQHC and] . . . results in payment to the [FQHC] of an amount" at

6   least equal to the PPS rate.  *Id.*

7        On February 28, 2012, CMS approved California's PPS in a state plan amendment.  (Doc.

8   No. 61-2 at 10.)[5]  Importantly, under that same state plan amendment, FQHCs can elect to include

9   costs from pharmacy services in the calculation of their PPS reimbursement amount, or to exclude

10  them altogether, in which case, the FQHCs would instead "have pharmacy services reimbursed on

11  a fee-for-service basis, utilizing the current fee schedules established for those services."  (*Id.* at

12  7.)  FQHCs also have the option to reverse this election of either including or excluding pharmacy

13  services by requesting a change in its "scope of services" that is subject to the PPS reimbursement

14  amount.  (*Id.*)  Thus, FQHCs in California can elect to receive their reimbursement for pharmacy

15  services through the PPS or through a different mechanism, such as FFS.[6]  *See* Cal. Welf. & Inst.

16  Code § 14132.100(k).

17       As alleged in plaintiffs' FAC, the ability to elect to exclude pharmacy services from being

18  reimbursed through the PPS had allowed FQHCs to instead obtain reimbursement for their

19  pharmacy services through contracts with managed-care organizations.  (FAC at ¶ 97.)  This

20  _____

21  [5]  With her motion, defendant Baass filed an unopposed request that the court take judicial notice
    of certain provisions of California's state plan entitled, "State Plan Amendment:  Prospective
22  Payment Reimbursement," at Attachment 4.19-B, pages 6–6Y.  (Doc. No. 61-2 at 2.)  Given that
    this is an official and public document and plaintiffs do not oppose the request, defendant Baass's
23  request for judicial notice will be granted.  *See* Fed. R. Evid. 201(b); *Asante v. California Dep't of
    Health Care Servs.*, 155 F. Supp. 3d 1008, 1018 (N.D. Cal. 2015) (taking "judicial notice of
24  California's State Medicaid Plan"), *rev'd on other grounds*, 886 F.3d 795 (9th Cir. 2018).

25  [6]  Although the text of the state plan amendment providing the election to exclude pharmacy
    services from an FQHC's PPS reimbursement amount states that those pharmacy services would
26  be "reimbursed on a *fee-for-service* basis, utilizing the current fee schedules established for those
    services" the parties appear to agree that the practical effect of this election allowed FQHCs to be
27  reimbursed through contracts with manage-care organizations under Medi-Cal's managed-care
28  system.  (*See* Doc. No. 61-1 at 9–10; FAC at ¶¶ 39, 41.)

6

1   election served not just as an alternative reimbursement mechanism for an FQHC's pharmacy

2   services, but as a clearly superior option that became an important funding source for plaintiffs,

3   and FQHCs generally in California.  (*See id.* at ¶¶ 95–98.)  Specifically, an FQHC electing to

4   exclude pharmacy services from its PPS reimbursement amount could keep any revenues it

5   generated based on the difference between the cost of prescription drugs it purchased and the

6   negotiated rates it received from Medi-Cal managed-care organizations for providing covered

7   prescriptions to the managed-care organizations' Medi-Cal members.  (*Id.* at ¶ 97.)  The FQHCs

8   could save on or generate significant additional funding this way because FQHCs are considered

9   "covered entities" under the federal 340B Drug Pricing program ("340B Program"), which

10   requires drug manufacturers participating in Medicaid to sell designated outpatient drugs at

11   discounted rates to covered entities.  *See* 42 U.S.C. §§ 256b(a)(4), 1396r-8.

12         For instance, plaintiffs allege in their FAC that "[s]ales of 340B medications totaled

13   approximately $29 billion in 2019" and "covered entities saved between 25 and 50 percent of the

14   total amount of money they would have spent on non-340B priced medications."  (FAC ¶¶ 76,

15   95.)  All of the plaintiff FQHCs participate in the 340B Program, which has allowed them to

16   generate additional revenue from negotiated rates with managed-care organizations for their

17   Medi-Cal patients that have been well above their 340B Program purchase price for certain

18   prescription drugs.  (*Id.* at ¶¶ 2, 12, 95–97.)  The transition to Medi-Cal Rx prevents FQHCs from

19   taking advantage of this funding source because reimbursement of pharmacy services is carved

20   out of managed-care contracts.  (*Id.* at ¶¶ 97, 99.)

21   **C.     California's Transition to Medi-Cal Rx**

22         On January 7, 2019, Governor Gavin Newsom issued Executive Order No. 01-19 which

23   instructed the DHCS to, among other things, "take all necessary steps to transition all pharmacy

24   services for Medi-Cal managed care to a fee-for-service benefit . . . in order to create significant

25   negotiating leverage on behalf of over 13 million Californians and generate substantial annual

26   savings."  Exec. Order No. 01-19 at 2;[7] (FAC at ¶ 37.)  To implement Governor Newsom's

27

28   [7]  Pursuant to Federal Rule of Evidence 201(b), the court takes judicial notice of Executive Order No. 01-19, which is available on the Governor's website:  https://perma.cc/YG5W-LFQJ.

1   executive order, the DHCS proposed Medi-Cal Rx, which sought to carve out pharmacy services

2   from the state's contracts with managed-care organizations, thereby transitioning all pharmacy

3   services in California to an FFS model.  (Doc. No. 66-6 at 29;[8] FAC at ¶¶ 2, 39, 65, 99.)

4   Specifically, on June 30, 2021, the DHCS sought authorization from CMS to implement Medi-

5   Cal Rx as part of a broad package of reforms and initiatives titled "California Advancing and

6   Innovating Medi-Cal" ("CalAIM").  (Doc. No. 66-6; FAC at ¶¶ 42, 44.)  The specific

7   authorization that CMS provided—called a "§ 1915(b) Waiver"—allows CMS to waive most

8   state plan requirements under 42 U.S.C. § 1396a "to provide the flexibility needed to enable

9   States to try new or different approaches to the efficient and cost-effective delivery of health care

10  services."  42 C.F.R. § 430.25(b).  Section 1915(b) Waivers "permit a State to implement

11  innovative programs or activities on a time-limited basis," which are "subject to specific

12  safeguards for the protection of beneficiaries and the program."  *Id.*  However, not all state plan

13  requirements can be waived by CMS.  Most notably, § 1396a(bb), the provision establishing that

14  states must reimburse FQHCs for services rendered to Medicaid patients in accordance with the

15  PPS amount, is not subject to waiver.  (FAC at ¶ 34); 42 U.S.C. § 1396n(b).

16       On December 29, 2021, CMS approved California's § 1915(b) Waiver application for

17  CalAIM, which encompassed approval of Medi-Cal Rx.  (FAC at ¶ 44; Doc. No. 66-7.)  Medi-

18  Cal Rx and the other reforms approved by CMS in California's § 1915(b) Waiver then went into

19  effect on January 1, 2022.  (FAC at ¶ 42; Doc. No. 66-7 at 5.)

20  /////

21

---

22  [8]  With her pending motion to dismiss, defendant Brooks-LaSure filed an unopposed request that
    the court take judicial notice of five exhibits:  (i) California State Plan Amendment, Prospective
23  Payment Reimbursement, Attachment 4.19-B, at pp. 6–6Z; (ii) California State Plan Amendment
    17-0002 (with page numbers added); (iii) Mercer Health & Benefits LLC, *Professional*
24  *Dispensing Fee and Actual Acquisition Cost Analysis for Medi-Cal—Pharmacy Survey Report*
    (Jan. 4, 2017); (iv) Cal. Dep't of Health Care Servs., *Section 1915(b) Waiver Proposal for*
25  *California Advancing and Innovating Medi-Cal (CalAim)* (Excerpts) (Submitted June 30, 2021);
    and (v) Ctrs. for Medicare & Medicaid Servs., Letter Approving Section 1915(b) Waiver
26  Proposal for California Advancing and Innovating Medi-Cal (CalAim) (Dec. 29, 2021).  (Doc.
    Nos. 66–2–66-7.)  Given that these are publicly available, official state documents, and plaintiffs
27  do not oppose the request, the court will grant defendant Brooks-LaSure's request for judicial
    notice.  *See* Fed. R. Evid. 201(b).

28

**D.     California's Fee-For-Service Reimbursement Model for Pharmacy Services**

Due to the state's transition to Medi-Cal Rx, pharmacy services have been carved out from the managed-care contracts covering Medi-Cal beneficiaries.  Thus, FQHCs can no longer negotiate with managed-care organizations for reimbursements on prescription drugs that FQHCs provide to Medi-Cal beneficiaries.  Instead, pharmacy services provided to Medi-Cal beneficiaries by FQHCs will be reimbursed by the state on an FFS basis.[9]  Approved by CMS in 2017, California state plan amendment ("SPA") 17-0002 established the state's FFS reimbursement system for Medi-Cal covered outpatient drugs.  (FAC at ¶¶ 25, 32, 56; Doc. No. 66-4.)  At the time SPA 17-0002 was approved by CMS, it did not apply to Medi-Cal providers who were reimbursing their pharmacy services through managed-care organizations.

Through SPA 17-0002, California, like other states, adopted an actual acquisition cost methodology for the reimbursement of covered outpatient drugs in accordance with a 2016 final rule that CMS promulgated titled the Covered Outpatient Drug Rule.  *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170 (Feb. 1, 2016), *codified at* 42 C.F.R. Part 447, subpart I §§ 447.500–447.522; (Doc. No. 66-4 at 3) (explaining in CMS's letter approving SPA 17-0002 that it "proposes to bring California into compliance with the reimbursement requirements in the Covered Outpatient Drug final rule").  Prescription drug reimbursement under the Covered Outpatient Drug Rule, as adopted in California through SPA 17-0002, has two components:  the "drug ingredient cost" of a prescription drug and a "professional dispensing fee."  (Doc. No. 66-4 at 5.)  The "drug ingredient cost" is defined as the lowest of three different official metrics:  the National Average Drug Acquisition Cost (or when that is not available, the Wholesale Acquisition Cost); the Federal Upper Limit; or the Maximum Allowable Ingredient Cost.  (*Id.*)  The "professional dispensing fee" is based on a pharmacy's total (Medicaid and non-Medicaid) annual claim volume of the previous year; a pharmacy with more than 90,000 claims receives a fee of $10.05 per outpatient drug dispensed while a pharmacy with fewer than 90,000

---

[9]  Assuming, of course, that a California FQHC has elected to exclude reimbursement for pharmacy services from its PPS reimbursement amount.  Cal. Welf. & Inst. Code § 14132.100(k); (Doc. No. 61-2 at 7).

claims receives a fee of $13.20 per outpatient drug dispensed.  (*Id.*); *see also* 42 C.F.R. § 447.502.
However, for covered entities such as FQHCs purchasing drugs through the 340B Program, SPA
17-0002 provides that they "will be reimbursed an amount not to exceed the entity's actual
acquisition cost for the drug, as charged by the manufacturer at a price consistent with [42 U.S.C.
§ 256b], plus the professional dispensing fee" described above.  (Doc. No. 66-4 at 6.)  Thus,
under Medi-Cal Rx, an FQHC that elects to exclude reimbursement of its pharmacy services from
the PPS rate will have them reimbursed by way of SPA 17-0002's FFS methodology—i.e., the
actual acquisition cost methodology.  (FAC at ¶¶ 56–57.)

The Covered Outpatient Drug Rule required that a state plan amendment instituting the
actual acquisition cost methodology be supported by adequate data.  *See* 42 C.F.R. §
447.518(d)(1); (FAC at ¶¶ 49–50.)  To satisfy the Covered Outpatient Drug Rule's data
requirements, the DHCS supported its submission of SPA 17-0002 to CMS with a study referred
to as the Mercer Report.  (FAC at ¶ 50; Doc. No. 66-5.)  As alleged by plaintiffs in their FAC and
stated in the Mercer Report, DHCS engaged Mercer, a consultancy, to conduct a study of
outpatient pharmacy provider costs associated with purchasing and dispensing covered outpatient
prescription drugs to Medi-Cal beneficiaries.  (FAC at ¶ 50; Doc. No. 66-5 at 4.)

**E.    Plaintiffs' Lawsuit**

As noted above, plaintiffs have sued the administrator of the CMS (defendant Brooks-
LaSure) and the director of the DHCS (defendant Baass) "to challenge the approval of Medi-Cal
Rx because the approval was arbitrary and capricious in that, as approved, Medi-Cal Rx violates
[p]laintiffs' right to reimbursement guaranteed under federal law."  (FAC at ¶ 1.)

Plaintiffs asserts four claims in their FAC:  (1) a claim brought against defendant Baass
under 42 U.S.C. § 1983 for violating plaintiffs' right to reimbursement under 42 U.S.C. §
1396a(bb); (2) a claim brought against defendant Brooks-LaSure under the Administrative
Procedures Act ("APA") based upon CMS's alleged erroneous approval of paragraph 7 of SPA
17-0002 ("SPA 17-0002, ¶ 7"), which contains the specific FFS reimbursement methodology for
prescription drugs dispensed to Medi-Cal beneficiaries by FQHCs (i.e., the actual acquisition cost
methodology); (3) a claim brought against defendant Brooks-LaSure under the APA based upon

1  CMS's alleged erroneous approval of Medi-Cal Rx; and (4) a claim for declaratory relief against

2  all defendants.  (FAC at ¶¶ 106–133.)

3  **F.     Procedural Background**

4           Plaintiffs initiated this lawsuit on October 29, 2020.  (Doc. No. 1.)  Ten days later, on

5  November 9, 2020, they filed a motion for a temporary restraining order seeking to enjoin

6  defendants from implementing California's transition to Medi-Cal Rx.  (Doc. No. 6.)  On

7  November 25, 2020, the previously assigned district judge denied plaintiffs' motion for a

8  temporary restraining order, finding that they had failed to make an adequate showing that they

9  faced an immediate risk of irreparable harm and because issuing an injunction would have

10 constituted the ultimate relief plaintiffs sought.  (Doc. No. 19 at 2.)

11          A month later, on December 24, 2020, plaintiffs filed a motion for a preliminary

12 injunction seeking the same relief as they had sought in their prior motion for a temporary

13 restraining order.  (Doc. No. 22.)  On the same day, then-defendants DHCS and Lightbourne, the

14 then-director of DHCS, filed a motion to dismiss pursuant to Federal Rule of Civil Procedure

15 12(b)(1) and 12(b)(6).  (Doc. No. 23.)  On March 9, 2021, the court held a hearing on the two

16 motions.  (Doc. No. 37.)  In an oral ruling issued from the bench, the previously assigned district

17 judge granted then-defendants DHCS's and Lightbourne's motion to dismiss without prejudice on

18 ripeness and primary jurisdiction grounds, and advised plaintiffs to, among other things, file their

19 FAC once CMS had acted on the approval that DHCS was seeking for Medi-Cal Rx.  (*See* Doc.

20 No. 41.)  At that time, plaintiffs' motion for a preliminary injunction was denied as having been

21 rendered moot by the court's granting of defendants' motion to dismiss.  (Doc. No. 38.)

22 On December 30, 2021, the day after CMS officially approved DHCS's proposed implementation

23 of Medi-Cal Rx, which was set to go into effect on January 1, 2022, plaintiffs filed both the

24 operative FAC and another motion for a temporary restraining order seeking to enjoin the

25 implementation of Medi-Cal Rx.  (Doc. Nos. 45, 46.)  On January 10, 2022, the previously

26 assigned district judge denied plaintiff's motion for a temporary restraining order in a minute

27 order, reasoning that plaintiffs had not made an adequate showing that Medi-Cal Rx

28 /////

1   would cause them economic harm before the court could resolve the dispute by way of a properly

2   noticed motion.  (Doc. No. 54.)

3        On February 8 and March 10, 2022, defendants Baass and Brooks-LaSure, respectively,

4   each filed their own motions to dismiss plaintiffs' FAC with respect to all claims asserted against

5   each of them in their official capacities.  (Doc. Nos. 61, 66.)  Plaintiffs filed their oppositions to

6   both motions on March 18 and April 22, 2022, respectively.  (Doc. Nos. 69, 75.)  Defendants

7   Baass and Brooks-LaSure filed reply briefs in support of their respective motions on April 8 and

8   May 20, 2022.  (Doc. Nos. 70, 76.)

9        On January 24 and February 6, 2023, non-parties California Primary Care Association and

10  National Association of Community Health Centers, respectively, each filed motions requesting

11  leave to file amicus curiae briefs regarding the pending motions to dismiss.  (Doc. Nos. 81, 84.)

12  On February 14, 2023, the undersigned granted both unopposed motions for leave to file amicus

13  curiae briefs.  (Doc. No. 86.)  That same day, the California Primary Care Association and the

14  National Association of Community Health Centers filed their amicus curiae briefs.  (Doc. Nos.

15  87, 88.)  The court has reviewed the amicus curiae briefs and appreciates their submission.

16                              **LEGAL STANDARD**

17       The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

18  sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

19  1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

20  sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

21  F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to

22  relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

23  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

24  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

25  Iqbal*, 556 U.S. 662, 678 (2009).

26       In determining whether a complaint states a claim on which relief may be granted, the

27  court accepts as true the allegations in the complaint and construes the allegations in the light

28  most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However,

the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the court is permitted to consider material that is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiffs' complaint necessarily relies on them, and matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). Where the "entire case on review is a question of law, and only a question of law," there is no inherent barrier to reaching the merits of an action at the 12(b)(6) stage because a court can fully resolve any purely legal question on a motion to dismiss. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

## ANALYSIS

### A.     Plaintiffs' Reimbursement Rights Under 42 U.S.C. § 1396a(bb) (Claim 1)

Section 1983 provides that "[e]very person who, under color of any [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . shall be liable to the party injured . . . ." 42 U.S.C. § 1983. "Section 1983 does not create substantive rights; it merely serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617 (1979)); *see also McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019). "To state a claim under § 1983, a plaintiff must allege

13

1   two essential elements:  (1) that a right secured by the Constitution or laws of the United States

2   was violated, and (2) that the alleged violation was committed by a person acting under the color

3   of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (citation

4   omitted).  The Ninth Circuit has held that Medicaid providers such as FQHCs "have a private

5   right of action to bring a § 1983 claim to enforce 42 U.S.C. § 1396a(bb)."  *Cal. Ass'n of Rural*

6   *Health Clinics*, 738 F.3d at 1013.  Here, plaintiffs are asserting that their right to reimbursement

7   under § 1396a(bb) has been violated by defendant Baass, the director of DHCS.

8           Section 1396a(bb) generally requires that "the State plan shall provide for payment for

9   services described in section 1396d(a)(2)(C) . . . furnished by [FQHCs]."  42 U.S.C. §

10   1396a(bb)(1).  It also sets forth the PPS framework for determining reimbursement amounts that

11   the state pays directly to FQHCs.  *Id.* § 1396a(bb)(1)–(4).  Under the PPS framework, which went

12   into effect in fiscal year 2001, state plans are required to "provide for payment for such services

13   [provided by an FQHC] in an amount (calculated on a per visit basis) that is equal to 100 percent

14   of the average of the costs of the center or clinic of furnishing such services during fiscal years

15   1999 and 2000 which are reasonable."  *Id.* § 1396a(bb)(2).  In other words, each FQHC's

16   "reasonable costs for providing Medicaid services for the years 1999 and 2000 were added

17   together, and the sum was divided by the total number of visits by Medicaid patients in those two

18   years to obtain an average per-visit cost rate."  *Three Lower Counties*, 498 F.3d at 298.  "This

19   average per-visit cost rate for the years 1999 and 2000 became the baseline per-visit rate to be

20   applied in all future years, adjusted by a cost-of-living index (the Medicare Economic Index) and

21   any change in the scope of services."  *Id.* (citing 42 U.S.C. § 1396a(bb)(2)–(3)).  Thus, to

22   calculate an FQHC's Medicaid reimbursement under the PPS "for each fiscal year beginning

23   2001 and thereafter, the average per-visit cost rate calculated for 1999 and 2000 is multiplied by

24   the number of visits made by Medicaid patients in the applicable fiscal year (2001 or later),

25   adjusted by the cost-of-living index and for any change in the scope of services."  *Id.*  If an FQHC

26   becomes federally qualified after the year 2000, it receives a reimbursement payment equal to

27   "100 percent of the costs of furnishing [defined] services" during their first year, which is then

28   /////

14

1   adjusted in each subsequent year by the cost-of-living index and any change in the scope of

2   services.  42 U.S.C. § 1396a(bb)(4).

3        As explained above in the background section of this order, in addition to establishing the

4   PPS for FQHCs, § 1396a(bb) also includes a provision regarding "[a]lternative payment

5   methodologies."  42 U.S.C. § 1396a(bb)(6).  Under that alternative payment methodologies

6   provision, a state plan may provide for any kind of reimbursement mechanism instead of the PPS,

7   so long as the alternative payment methodology is both "agreed to by the State and [FQHC] . . .

8   [and] results in payment to the [FQHC] of an amount" at least equal to the PPS.  *Id.*

9        In the first claim of plaintiffs' FAC, they allege that "Medi-Cal Rx will require all of

10  [p]laintiffs' pharmacy services to be reimbursed through the FFS system established by SPA 17-

11  [0]002" and that this FFS system will not adequately reimburse plaintiffs as required under §

12  1396a(bb).  (FAC at ¶¶ 108–09.)  In defendant Baass's pending motion to dismiss she argues that

13  plaintiffs' first allegation—that Medi-Cal Rx *requires* all FQHCs to adopt the FFS reimbursement

14  methodology provided for in SPA 17-0002, ¶ 7—is simply "untrue."  (Doc. No. 61-1 at 13.)  The

15  court agrees with defendant Baas in this regard because the state plan plainly contradicts that

16  fundamental allegation advanced by plaintiffs.  *See* Cal. Welf. & Inst. Code § 14132.100(k);

17  (Doc. No. 61-2.)  As provided in the state plan amendment establishing California's PPS, an

18  FQHC "may elect to have pharmacy services reimbursed on a fee-for-service basis . . . [and] [a]n

19  FQHC . . . that reverses its election under this provision will revert to its prior [prospective

20  payment system] rate, subject to an increase to account for all [Medicare Economic Index]

21  increases occurring during the intervening time period."  (Doc. No. 61-2 at 7); *see also* Cal. Welf.

22  & Inst. Code § 14132.100(k) (codifying this portion of the state plan amendment regarding an

23  FQHC's ability to elect whether to include or exclude pharmacy services from the PPS).  Thus, if

24  an FQHC has already elected to include pharmacy services in its PPS reimbursement rate, or

25  elects now or in the future to do so, then the FQHC's pharmacy services are not reimbursed on an

26  FFS basis in accordance with SPA 17-0002, ¶ 7, but instead under the PPS rate determined in

27  accordance with § 1396a(bb).  In plaintiffs' opposition to the pending motion to dismiss, they do

28  not identify any particular provision of Medi-Cal Rx or CMS's approval thereof that imposes this

15

1    alleged requirement, and they have ultimately conceded that their allegation in this regard is

2    contrary to law.  (Doc. No. 69 at 9.)  At the hearing on the pending motions, plaintiffs' counsel

3    offered no argument supporting this fundamental allegation of their FAC and indeed explicitly

4    abandoned it.  Thus, because plaintiffs' allegation that Medi-Cal Rx "requires" them to accept an

5    FFS reimbursement for their pharmacy services is contracted by judicially noticeable facts, that

6    allegation of the FAC will be disregarded by the court.  *See Shwarz v. United States*, 234 F.3d

7    428, 435 (9th Cir. 2000) ("The court need not accept as true . . . allegations that contradict facts

8    that may be judicially noticed by the court[.]").

9         The unraveling of this core allegation by plaintiffs explains why their next contention—

10   that SPA 17-0002, ¶ 7's FFS methodology fails to fully compensate them in accordance with §

11   1396a(bb)—is both illogical and misguided.  As discussed above in the background section of

12   this order, SPA 17-0002 sought to align California with CMS's Covered Outpatient Drug Rule

13   promulgated in 2016; it is entirely separate from the PPS that ensures FQHCs are reimbursed

14   pursuant to § 1396a(bb).  (*Compare* Doc. No. 61-2 (state plan amendment establishing PPS

15   applicable to FQHCs) *with* Doc. No. 66-4 (state plan amendment 17-0002 establishing an FFS

16   reimbursement mechanism generally applicable to outpatient prescription drugs for Medi-Cal

17   providers).)  Because FQHCs are not required to have their pharmacy services reimbursed under

18   the specific FFS methodology established by SPA 17-0002, ¶ 7, there is simply no basis for

19   plaintiffs' contention that it fails to satisfy § 1396a(bb)—it is separate and apart from the PPS.

20   Plaintiffs can still elect to reimburse pharmacy services through their PPS rate.  Plaintiffs also

21   have failed to identify any legal authority that requires defendant Baass, as director of the DHCS,

22   to offer plaintiffs an alternative to the PPS for the reimbursement of their pharmacy services, such

23   as a return to the previous regime where plaintiffs could reimburse pharmacy services through

24   managed-care organizations.  Importantly, plaintiffs do not allege any specific facts plausibly

25   indicating that the reimbursement of their pharmacy services through SPA 17-0002, ¶ 7's FFS

26   methodology results in their receiving an amount less than they would receive if they elected to

27   /////

28   /////

16

1  reimburse pharmacy services under the PPS, which is the amount that plaintiffs are entitled to.[10]

2  At the hearing, plaintiffs' counsel conceded that it is unknown whether the amount plaintiffs

3  would receive through reimbursing pharmacy services under SPA 17-0002, ¶ 7's FFS

4  methodology would in fact be less than if plaintiffs elected to receive their reimbursement of

5  pharmacy services through the PPS rate.  Instead, plaintiffs' counsel indicated that her clients

6  merely believed that the SPA 17-0002, ¶ 7's FFS reimbursement amount would be less than the

7  costs that they are incurring.  These admissions by plaintiffs provide additional support for the

8  court's conclusion that plaintiffs have failed to assert a legally cognizable claim.  Moreover, they

9  reflect that plaintiffs are overlooking what exactly they are entitled to under § 1396a(bb), which is

10  not necessarily any and all costs incurred, as the court will now explain.

11        Plaintiffs repeatedly misstate the reimbursement standard established by § 1396a(bb) that

12  they allege SPA 17-0002, ¶ 7's FFS methodology fails to satisfy.  In their FAC, plaintiffs allege

13  that FQHCs are entitled to reimbursement of 100 percent of their "actual and reasonable" costs.

14  (FAC at ¶¶ 4, 31, 39, 46, 66.)  In plaintiffs' brief in opposition to the pending motion to dismiss,

15  they further contend that § 1396a(bb) sets a "100 percent reimbursement standard, and that

16  standard applies to the FFS system."  (Doc. No. 69 at 9–11.)  However, as has been explained

17  above, § 1396a(bb) requires only that FQHCs be guaranteed the PPS rate.  The PPS rate is set at

18  100 percent of an FQHC's average reasonable costs during the FQHC's base year used to

19  determine its initial PPS rate that is then adjusted only under the Medicare Economic Index or

20  when there is a recognized change in the scope of services.  *See* 42 U.S.C. § 1396a(bb)(2)–(4);

---

21  [10]  Plaintiffs repeatedly cite the decision in *California Association of Rural Health Clinics*, 738
22  F.3d at 1013 in support of their opposition to defendant Baass' motion to dismiss.  However, that
   case addressed a situation quite unlike the one before this court.  In *California Association of*
23  *Rural Health Clinics*, the Ninth Circuit held that a newly enacted California statute eliminating
   the reimbursement of FQHCs for "certain Medi–Cal benefits that the state deemed optional,
24  including adult dental, podiatry, optometry and chiropractic services" directly conflicted with the
   Medicaid statute, which the Ninth Circuit had interpreted to require reimbursement from the state
25  for those eliminated services.  *See* 738 F.3d at 1010, 1015–17.  In contrast, nothing regarding
   Medi–Cal Rx prevents FQHC's from receiving the full PPS amount they are entitled to under §
26  1396a(bb).  Rather, it appears that plaintiffs principally argue only that the amount of funds that
   they will receive under Medi–Cal Rx (if they elect FFS reimbursement for pharmacy services) is
27  less than under the old regime whereby FQHCs could reimburse their pharmacy services through
   managed-care organizations.
28

1  *Three Lower Counties*, 498 F.3d at 298; *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129,

2  137 (2d Cir. 2014); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 61–62 (1st Cir.

3  2005).[11] Thus, plaintiffs in this case cannot plausibly allege that the amount they would receive

4  under SPA 17-0002, ¶ 7's FFS methodology is less than the amount to which they are entitled

5  under the PPS.

6       Plaintiffs also advance three additional arguments that this court has strained to

7  understand and ultimately find to be unavailing.

8       First, plaintiffs appear to contend that this case concerns factual issues, not legal ones,

9  resolution of which at the motion to dismiss stage of the litigation would be "premature."  (Doc.

10  No. 69 at 8–10.)  In this respect, plaintiffs are fundamentally mistaken.  "Dismissal under Rule

11  12(b)(6) may be based on either:  (1) lack of a cognizable legal theory, or (2) insufficient facts

12  under a cognizable legal theory."  *Parker v. Sea-Mar Cmty. Health Ctr.*, 853 F. App'x 197, 197–

13  98 (9th Cir. 2021)[12] (affirming the granting of a motion to dismiss due to the plaintiff's failure to

14  state a cognizable theory under the False Claims Act), *cert. denied*, ___ U.S. ___, 142 S. Ct. 897

15  (2022); *see also Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir.

16  2008).  Although plaintiffs emphasize in their opposition brief that they have alleged sufficient

17  facts to move past the pleadings stage (Doc. No. 69 at 9–11), defendant Baass is moving to

18  dismiss plaintiffs' FAC due to its purported "lack of a cognizable legal theory," not a dearth of

19  supporting factual allegations.  *Parker*, 853 F. App'x at 197.  Nor can plaintiffs plead their own

20  legal interpretations as factual allegations and expect the court to treat those allegations as true.

---

21  [11]  In plaintiffs' opposition, they rely on a non-binding California Court of Appeal decision in

22  *Tulare Pediatric Health Care Ctr. v. State Dep't of Health Care Servs.*, 41 Cal. App. 5th 163
    (2019) for the proposition that § 1396a(bb), a federal law, requires that the state pay 100 percent

23  of an FQHC's costs.  (Doc. No. 69 at 8, 10–11.)  However, *Tulare* involved the determination of
    an initial PPS rate for an FQHC after the year 2000 and the state appellate court's decision in that

24  case is not inconsistent with this court's reading of § 1396a(bb).  *See* 41 Cal. App. 5th at 171
    (finding that the state auditor's attempt to reduce initial per-visit patient rate for the PPS violated

25  § 1396a(bb)).  As this court has explained, the "100 percent reimbursement standard" provided
    for in § 1396a(bb) is specifically defined in that statute and varies depending on the

26  circumstances of each FQHC to which it is applied.

27

28  [12]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
    36-3(b).

1   *See Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of

2   the factual allegations in the complaint as true, we 'are not bound to accept as true a legal

3   conclusion couched as a factual allegation.'") (citation omitted).  This is another reason why

4   plaintiffs' allegations that they are "required" to be reimbursed under SPA 17-0002, ¶ 7's FFS

5   methodology, an allegation plainly contradicted by the terms of the state plan amendment, will be

6   disregarded by this court.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

7   2001) ("The court need not, however, accept as true allegations that contradict matters properly

8   subject to judicial notice or by exhibit.").  For this same reason, plaintiffs' repeated allegation and

9   contention that § 1396a(bb) sets a "100 percent reimbursement standard, and that standard applies

10  to the FFS system" is a mischaracterization of what that statute actually provides for under its

11  own terms.

12          Second, plaintiffs contend that SPA 17-0002, ¶ 7's FFS methodology constitutes an

13  alternative payment methodology under § 1396a(bb)(6) and, as an alternative payment

14  methodology, fails to satisfy the state's obligation to reimburse FQHCs in accordance with §

15  1396a(bb).  (Doc. No. 69 at 9.)  Preliminarily, it is unclear whether this challenge now advanced

16  by plaintiffs is properly before the court since there is no mention of alternative payment

17  methodologies, or a citation to the subsection referencing them, in plaintiffs' FAC.  *See, e.g.*,

18  *Ariz. Civ. Constructors, Inc. v. Colony Ins. Co.*, 481 F. Supp. 3d 1141, 1147 (D. Nev. 2020) ("[A]

19  deficient pleading cannot be cured by new allegations raised in a plaintiff's response to a motion

20  to dismiss.") (citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)).

21          Assuming, without deciding, that plaintiffs argument in this regard is properly before it,

22  the court concludes that merely characterizing SPA 17-0002, ¶ 7's FFS methodology as an

23  improper alternative payment methodology under § 1396a(bb)(6) fails to state a cognizable legal

24  theory for several reasons.  First, that contention is also inconsistent with the text of the relevant

25  portions of the state plan.  That plan actually delineates several alternative payment

26  methodologies that FQHCs can elect to be reimbursed under, instead of the PPS rate, but an

27  option to elect to exclude pharmacy services from the PPS rate (and thus have them reimbursed

28  under SPA 17-0002, ¶ 7's FFS methodology) is not listed as one of them.  (*See* Doc. No. 61-2 at

7) (providing that the pharmacy services election is located in section A, paragraph 6 with the heading "General Applicability" while sections E, F, H, and I are titled "Alternative Payment Methodology").  In addition, an alternative payment methodology must (i) be agreed to by the FQHC and the state, and (ii) provide at least the same level of payment to the FQHC as the PPS provides.  *See* 42 U.S.C. § 1396a(bb)(6).  Here, plaintiffs fail to explain in their opposition, let alone allege in their FAC, how the supposed alternative payment methodology does not reach the same level of reimbursement as the PPS or that it was an arrangement they are being forced to accept.  As mentioned above, plaintiffs' counsel conceded at the hearing that plaintiffs do not even know if the amount received through SPA 17-0002, ¶ 7's FFS methodology—whether characterized as an alternative payment methodology or not—would be less than the amount that FQHCs are entitled to receive under their PPS rate.  Finally, and most importantly, plaintiffs also fail to explain exactly how characterizing SPA 17-0002, ¶ 7's FFS methodology as an alternative payment methodology would mean it alters or prevents FQHCs from receiving the full amount of reimbursement that they are entitled to under the PPS rate given the fact that FQHCs can simply opt out of SPA 17-0002, ¶ 7 for pharmacy services and receive the full amount that they are due under the PPS rate.

Third, plaintiff introduces a similar legal theory that appears both unwedded to the allegations of the FAC and untimely.  In this regard, plaintiffs argue that even if they could elect to proceed with reimbursement under the PPS (which the law unequivocally states that they can), the PPS itself fails to comply with § 1396a(bb).  (Doc. No. 69 at 12.)  However, as defendant Baass argues, any challenge to each of plaintiffs' own PPS rate is facially barred by the applicable two-year statute of limitation because the relevant provisions of the state plan were adopted in 2012 and plaintiffs have not alleged the resetting of their PPS rate within two years of this lawsuit being filed.  *See St. Anthony Med. Centers v. Kent*, 748 F. App'x 104, 106 (9th Cir. 2018)[13] (finding that an FQHC's § 1983 claim challenging the setting of its prospective payment system reimbursement rate was time-barred when its action was brought eleven years after the setting of

---

[13] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   the initial rate).  At the hearing, their counsel admitted that plaintiffs did not raise a challenge to

2   the PPS in their FAC and appeared to also acknowledge that this action was not the vehicle for

3   presenting such a challenge.

4         Accordingly, for all of the reasons explained above, the court will grant defendant Baass's

5   motion to dismiss plaintiff's first claim.

6   **B.      Plaintiffs' APA Claims (Claims 2–3)**

7         In plaintiffs' FAC, they assert two claims against defendant Brooks-LaSure under the

8   APA for the allegedly erroneous approval of both (i) SPA 17-0002, ¶ 7's FFS reimbursement

9   methodology for prescription drugs dispensed to Medi-Cal beneficiaries by FQHCs (claim 2), and

10  (ii) Medi-Cal Rx, which results in FQHCs being reimbursed under SPA 17-0002, ¶ 7's FFS

11  reimbursement methodology if they elect to do so (claim 3).  (FAC at ¶¶ 112–28.)

12        "The APA sets forth the procedures by which federal agencies are accountable to the

13  public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of*

14  *Univ. of Cal.*, __U.S.__, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation

15  omitted).  Only "final agency actions are reviewable under the APA."  5 U.S.C. § 704; *see also* 5

16  U.S.C. § 701 (for purposes of the APA's judicial review provisions, "agency action" has "the

17  meaning[] given" by 5 U.S.C. § 551).  An "'agency action' includes the whole or a part of an

18  agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

19  5 U.S.C. § 551(13).  Under § 706 of the APA, the court is "to assess only whether the decision

20  was based on a consideration of the relevant factors and whether there has been a clear error of

21  judg[]ment."  *Regents*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted); *see also*

22  *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*,

23  988 F.3d 1170, 1178 (9th Cir. 2021).

24        The APA "requires agencies to engage in reasoned decisionmaking, and directs that

25  agency actions be set aside if they are arbitrary or capricious."  *Regents*, 140 S. Ct. at 1905.

26  (internal citations and quotation marks omitted).  An agency's "determination in an area

27  involving a 'high level of technical expertise'" is to be afforded deference.  *The Lands Council v.*

28  *McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) (citing 5 U.S.C. § 706(2)(A)), *overruled in*

1    *part on other grounds by Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008); *see also*

2    *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1074 (9th Cir. 2014).  The district court's

3    role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its

4    action 'arbitrary and capricious.'"  *McNair*, 537 F.3d at 993 (citing *Marsh v. Or. Nat. Res.*

5    *Council*, 490 U.S. 360, 378 (1989)).  "Factual determinations must be supported by substantial

6    evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection between

7    facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains Biodiversity*

8    *Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations omitted).  This

9    requires the court to ensure that the agency has not, for instance:

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or [an explanation that] is so
> implausible that it could not be ascribed to a difference in view or
> the product of agency expertise.

14   *McNair*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

15   *Co.*, 463 U.S. 29, 43 (1983)); *see also Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 492

16   (9th Cir. 2023) (articulating same arbitrary or capricious standard).

17          1.      CMS's Approval of SPA 17-0002, ¶ 7 (Claim 2)

18          The first agency action that plaintiffs challenge is CMS's approval of SPA 17-0002, ¶ 7.

19   (FAC at ¶¶ 112–17.)  Plaintiffs argue CMS's approval was arbitrary and capricious because it

20   relied on an insufficient and incomplete analyses of pharmacy service costs that did not satisfy the

21   Covered Outpatient Drug Rule's data requirements under 42 C.F.R. § 447.518(d)(1).  (*Id.* at ¶

22   114.)  Specifically, plaintiffs allege that CMS's reliance on the Mercer Report was deficient

23   because CMS did not consider the unique pharmacy costs faced by FQHCs.  (*Id.* at ¶¶ 50–54.)

24   Plaintiffs also assert that this failure to consider adequate data in keeping with requirements of the

25   Covered Outpatient Drug Rule resulted in SPA 17-0002, ¶ 7's FFS methodology reimbursing

26   FQHCs in an amount below what they are entitled to under § 1396a(bb).  (*See id.* at ¶¶ 46–54,

27   60–66, 69–74, 113–14.)

28   /////

1   As explained in the background section of this order above, the Covered Outpatient Drug

2   Rule was promulgated by CMS in 2016 in order to adopt an actual acquisition cost methodology

3   for reimbursement of covered outpatient drugs.  This methodology has two components:  the

4   "drug ingredient cost" of a prescription drug and a "professional dispensing fee."  Under the

5   Covered Outpatient Drug Rule, when a state proposes changes to its state plan to conform with

6   the actual acquisition cost methodology, it must adhere to specific data requirements:  "States

7   must provide adequate data such as a State or national survey of retail pharmacy providers or

8   other reliable data other than a survey to support any proposed changes to either or both of the

9   components of the reimbursement methodology."  42 C.F.R. § 447.518(d)(1).

10   Moreover, under the Covered Outpatient Drug Rule, the "professional dispensing fee"

11   component has been given a particular definition.  Specifically, it is a professional fee that is

12   "incurred at the point of sale" and "[i]ncludes only pharmacy costs associated with ensuring that

13   possession of the appropriate covered outpatient drug is transferred to a Medicaid beneficiary."

14   42 C.F.R. § 447.502.  The Covered Outpatient Drug Rule also specifies that "pharmacy costs"

15   include, but are not limited to:

16   
17   reasonable costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measurement or mixing of the covered outpatient drug, filling the container, beneficiary counseling, physically providing the completed prescription to the Medicaid beneficiary, delivery, special packaging, and overhead associated with maintaining the facility and equipment necessary to operate the pharmacy.
18   
19   
20   

21   *Id.*

22   In her pending motion to dismiss, defendant Brooks-LaSure argues that CMS "reasonably

23   determined that the Mercer Report was 'adequate' under the Covered Outpatient Drug Rule to

24   support California's selection of 'ingredient cost' and 'professional dispensing fees' for the FFS

25   reimbursement formula in SPA 17-0002."  (Doc. No. 66-1 at 10.)  As highlighted in their

26   opposition brief, plaintiffs' chief complaint regarding the Mercer Report is that it did not consider

27   unspecified "additional dispensing costs" that covered entities, such as FQHCs, "may" face under

28   the 340B Drug Program.  (Doc. No. 75 at 10; FAC at ¶¶ 47–48.)  According to the allegations of

plaintiffs' FAC, the Mercer Report was based on survey data of retail pharmacies but only 0.2 percent of that data gathered consisted of responses received from FQHCs.[14]  (Doc. No. 75 at 10; FAC at ¶¶ 52–54.)

Critically, however, plaintiffs do not explain in the allegations of their FAC what "additional dispensing fees" FQHCs "may" face, how the Mercer Report failed to consider these unspecified "additional dispensing fees," or why the low survey response rate from FQHCs matters.  At the hearing on the pending motions, plaintiffs' counsel could not identify any additional dispensing fees that were in fact borne by plaintiffs but not considered by the Mercer Report.  Despite plaintiffs' argument regarding the alleged insufficiency of the date underlying the Mercer Report, the Covered Outpatient Drug Rule states that "States must provide adequate data *such as a State or national survey of retail pharmacy providers* or other reliable data other than a survey to support any proposed changes." 42 C.F.R. § 447.518(d)(1) (emphasis added). That is precisely what the Mercer Report provided:  a survey of California retail pharmacy providers.  (Doc. No. 66-5; FAC at ¶¶ 50–54.)  In fact, plaintiffs alleged in their own FAC that they overwhelmingly rely on "contract pharmacies" to provide pharmacy services, with a few in-house pharmacies.  (FAC at ¶¶ 13–22.)  Yet plaintiffs did not allege any meaningful differences between the two, how contract or in-house pharmacies differ from retail pharmacies (if at all), or how the Mercer Report failed to adequately consider contract or in-house pharmacies.  When asked about this at the hearing, plaintiffs' counsel merely listed general dispensing costs that were

---

[14]  The Mercer Report actually disclosed and explained the dearth of professional dispensing fee data it collected from FQHCs as follows:

> In spite of the numerous channels of communication leveraged and extensive direct stakeholder outreach requesting participation, costs of dispensing for clinic/outpatient, compounding, federally qualified health center/rural health clinic (FQHC/RHC) and specialty pharmacies could not be estimated because of the low number of responses for these pharmacy types.  Additionally, only one pharmacy with usable response data reported to be a 340B Covered Entity, and therefore 340B Covered Entities were not analyzed separately from community retail pharmacies that were not 340B Covered Entities.

(Doc. No. 66-5 at 7.)  In other words, the issuers of the Mercer Report sought data from FQHCs but simply did not receive survey responses from those entities.

1   no different than what a retail pharmacy would face and did not provide any explanation as to

2   why those costs would be different for plaintiffs.  Although plaintiffs vaguely allege in their FAC

3   that there are certain "[m]anufacturer overcharges" and "acquisition-related costs" that are

4   allegedly not reimbursed under the professional dispensing component of the FFS reimbursement

5   methodology (FAC at ¶ 57), it is entirely unclear why overlooking these items would be arbitrary

6   and capricious:  indeed, these vague costs do not appear to even fall within the definition of what

7   would be considered a professional dispensing fee.  *See* 42 C.F.R. § 447.502 ("[T]he professional

8   [dispensing] fee . . . [i]s incurred at the point of sale or service . . . [and] [i]ncludes only pharmacy

9   costs associated with ensuring that possession of the appropriate covered outpatient drug is

10  transferred to a Medicaid beneficiary.").

11         Thus, based on the allegations in the FAC, even when read in the light most favorable to

12  plaintiffs, CMS's determination that the Mercer Report satisfied the data requirements under 42

13  C.F.R. § 447.518(d)(1) was not arbitrary and capricious.  *See Managed Pharmacy Care v.*

14  *Sebelius*, 716 F.3d 1235, 1247–48 (9th Cir. 2013) (reversing a district court that disagreed with

15  CMS's approval of a state plan amendment, concluding that the district court had "delved into the

16  minutiae of the [CMS's] approval, picking apart DHCS's research and finding potential flaws—

17  an inappropriate exercise when reviewing agency action under the APA"); *see also League Of*

18  *Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir.

19  2010) (explaining that the "arbitrary and capricious standard is narrow" and that "deference [to

20  the agency] is highest when reviewing an agency's technical analyses and judgments involving

21  the evaluation of complex scientific data within the agency's technical expertise").

22         Moreover, SPA 17-0002, ¶ 7's FFS methodology is entirely unrelated to § 1396a(bb) and

23  its PPS rate that plaintiffs are entitled to receive.  The former is a general reimbursement

24  mechanism for covered outpatient prescription drugs for all Medi-Cal providers while the latter is

25  a specific provision outlining a baseline reimbursement guarantee for FQHCs rendering services

26  //////

27  /////

28  /////

1    to Medicaid patients—the two operate independently of one another.[15]  Put another way, the

2    FQHC-only PPS rate operates notwithstanding the existence of other Medicaid reimbursement

3    formulas that are generally applicable to other Medi-Cal providers, such as, for example, SPA 17-

4    0002, ¶ 7.  As defendant Brooks-LaSure correctly points out in her pending motion to dismiss,

5    CMS's approval of SPA 17-0002, ¶ 7's FFS methodology would not be arbitrary or capricious

6    because SPA 17-0002, ¶ 7 does not interfere with plaintiffs' ability to obtain the full PPS rate that

7    they are entitled to receive under § 1396a(bb).  (Doc. No. 66-1 at 12–13); *see also HealthproMed*

8    *Found., Inc.*, 982 F.3d at 17 ("States must reimburse the FQHCs for the full cost of these services

9    through a Prospective Payment System (PPS)."); *Legacy Cmty. Health Servs., Inc.*, 881 F.3d at

10    363 ("Section 1396a(bb) provides that the state is obligated to ensure that FQHCs are reimbursed

11    for covered Medicaid services . . . [and] sets forth the framework for assessing reimbursement

12    amounts:  the Prospective Payment System ('PPS').").  Indeed, this conclusion is consistent with

13    the court's determination as to plaintiffs' first claim that in their FAC plaintiffs have failed to

14    sufficiently allege how SPA 17-0002, ¶ 7's FFS methodology alters or prevents FQHCs from

15    achieving the full amount of reimbursement to which they are entitled under the PPS.

16        Lastly, plaintiffs' FAC alleges in passing that SPA 17-0002, ¶ 7's FFS methodology was

17    wrongfully approved by CMS without consideration of its impact on the access to, and quality of,

18    care as required by 42 U.S.C. § 1396a(a)(30)(A).  (FAC at ¶¶ 67–68.)  In this regard, §

19    1396a(a)(30)(A) requires that each Medicaid plan must:

20

21                provide such methods and procedures relating to the utilization of,
               and the payment for, care and services available under the plan . . .

---

22 [15]  Even if plaintiffs elected to exclude pharmacy services from their PPS rate under § 1396a(bb),
and the amount received to reimburse the excluded pharmacy services through SPA 17-0002, ¶ 7

23 was in fact less than plaintiffs would receive through a full PPS rate—a critical allegation that
plaintiffs do not advance—plaintiffs have presented no legal authority suggesting that this would

24 make CMS's approval of SPA 17-0002, ¶ 7 arbitrary or capricious.  In fact, under § 1395a(bb) it
appears more likely that the legal remedy would be to compel the state to pay plaintiffs a

25 supplemental payment making up the difference to ensure plaintiffs were receiving their full PPS
rate.  *Cf.* 42 U.S.C. § 1396a(bb)(5); *Three Lower Counties*, 498 F.3d at 299 (explaining that the

26 state is obligated to provide FQHCs a supplemental payment when an FQHC is not fully
compensated for the full amount of their PPS rate when receiving reimbursement through a

27 managed-care organization); *HealthproMed Found., Inc. v. Dep't of Health & Hum. Servs.*, 982
F.3d 15, 17 (1st Cir. 2020) (same).

28

> as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area. . . .

Here, however, CMS found that California had "provided data and studies to demonstrate that the acquisition cost methodology and pharmacy dispensing fees being paid are sufficient to assure that Medi-Cal beneficiaries will have access to pharmacy services at least to the extent as the general population." (Doc. No. 66-4 at 3.)  That data was the basis for the abovementioned Mercer Report.  Plaintiffs offer no other allegations aside from the purported deficiencies with the Mercer Report data in arguing that CMS did not consider § 1396a(a)(30)(A)'s requirements in its approval of SPA 17-0002, ¶ 7.  Not only are plaintiffs' allegations an insufficient basis upon which to assert that CMS acted arbitrarily, but CMS's determination that the Mercer Report was adequate to ensure compliance with § 1396a(a)(30)(A) is entitled to substantial deference.  *See Managed Pharmacy Care*, 716 F.3d at 1248–50 (holding that *Chevron* deference applies to CMS's interpretation of § 1396a(a)(30)(A) when it approves state plan amendments for compliance under that provision).  In fact, at least one district court has specifically found that CMS's approval of SPA 17-0002 did not run afoul of § 1396a(a)(30)(A).  *See Cal. Pharmacists Ass'n v. Kent*, No. 19-cv-02999-JSW, 2020 WL 4460547, at *4 (N.D. Cal. Feb. 21, 2020) (denying a motion for preliminary injunction seeking to enjoin implementation of SPA 17-0002 and concluding "that the Secretary's approval of SAP [sic] 17-0002 was based on his expertise and the data available, as well as a reasonable methodology in light of the requirements of [§ 1396a(a)(30)(A)]").

For these reasons, this court concludes that plaintiffs have failed to sufficiently allege that CMS's reliance on the Mercer Report in approving SPA 17-0002, ¶ 7 was arbitrary or capricious for failing to comply with the data requirements under the Covered Outpatient Drug Rule or the

/////

/////

/////

27

funding requirements of 42 U.S.C. § 1396a(a)(30)(A).[16]  In addition, plaintiffs have failed to

plausibly allege that the approval of SPA 17-0002, ¶ 7 alters or prevents—or is even necessarily

connected to—the PPS reimbursement rate specified in § 1396a(bb).  Accordingly, defendant

Brooks-LaSure's pending motion to dismiss will also be granted as to this claim.

2.      CMS's Approval of Medi-Cal Rx (Claim 3)

Plaintiffs' second challenge is to CMS's approval of Medi-Cal Rx on the grounds that this

agency action was inconsistent with federal law governing the 340B Program in various ways and

that Medi-Cal Rx is itself contrary to the purpose of the Medicaid Act.  (FAC at ¶¶ 120–28.)

First, plaintiffs allege in their FAC that Medi-Cal Rx imposes a flawed reimbursement

system under SPA 17-0002, ¶ 7 that deprives them of the reimbursement amount to which they

are entitled under § 1396a(bb) and will result in Medi-Cal failing to cover the costs of providing

services to Medi-Cal beneficiaries thereby improperly shifting the costs onto FQHC's § 330

grants contrary to Congressional intent.  (FAC at ¶¶ 45, 55, 122(a), (e).)  In defendant Brooks-

LaSure's pending motion to dismiss, she again argues that CMS's approval of Medi-Cal Rx is

unrelated to the reimbursement of FQHCs under § 1396a(bb).  (Doc. No. 66-1 at 15.)  The court

agrees.  Plaintiffs' allegations in this regard are simply another version of their same flawed

argument rejected by the court above.  Nothing in SPA 17-0002, ¶ 7 (via its implementation

through Medi-Cal Rx) disrupts the PPS reimbursement rate that FQHCs are entitled to receive

---

[16]  Although plaintiffs allege that the Mercer Report failed to consider data related to FQHC's "professional dispensing fees" and "ingredient cost," their FAC contains no allegations indicating in what way the failure to consider ingredient costs would be arbitrary or capricious.  SPA 17-0002, ¶ 7 sets the ingredient cost for FQHCs as the "actual acquisition cost for the drug, as charged by the manufacturer at a price consistent" with the 340B Drug Program—which is what the Covered Outpatient Drug Rule requires.  (Doc. No. 66-4 at 6) (providing that "Medi-Cal providers that are covered entities . . . and purchase drugs through the 340B Drug Pricing Program are required to use only 340B purchased drugs when dispensing drugs to Medi-Cal beneficiaries").  Indeed, plaintiffs apparently concede that this line of attack lacks merit by failing to address the ingredient cost component of SPA 17-0002, ¶ 7's FFS methodology in their opposition brief to the pending motion to dismiss.  At the hearing, while plaintiffs' counsel maintained that plaintiffs were not abandoning this contention, counsel also did not offer any explanation as to how setting reimbursement of 340B Program drugs to the price paid under that program could be arbitrary or capricious.  Accordingly, the court has only addressed the purported deficiencies with the professional dispensing fees component of SPA 17-0002, ¶ 7's FFS methodology.

1    under § 1396a(bb).  This is so because FQHCs are free to simply elect not to have their pharmacy

2    services reimbursed under SPA 17-0002, ¶ 7.  *See* Cal. Welf. & Inst. Code § 14132.100(k); (Doc.

3    No. 61-2 at 7).  Indeed, altering a FQHCs funding under § 1396a(bb) is explicitly prohibited by

4    statute in the context of § 1915(b) Waivers, such as Medi-Cal Rx.  *See* 42 U.S.C. § 1396n(b)

5    ("The Secretary, to the extent he finds it to be cost-effective and efficient and not inconsistent

6    with the purposes of this subchapter, may waive such requirements of section 1396a . . .other than

7    . . . [§] 1396a(bb) . . .."); (Doc. No. 66-6 at 17–18) (acknowledging that the state cannot waive the

8    PPS rate for FQHCs in its § 1915 Waiver for Medi-Cal Rx).  Thus, plaintiffs have failed to

9    plausibly allege that CMS's approval of Medi-Cal Rx resulted in their inability to obtain their full

10   reimbursement amount under § 1396a(bb)'s PPS rate.[17]

11           Second, plaintiffs allege that SPA 17-0002, ¶ 7's FFS methodology is preempted by the

12   federal Medicaid Exclusion File, which they argue is the exclusive mechanism for preventing

13   duplicate discounts or rebates of 340B Program drugs.  (FAC at ¶¶ 75–93, 122(b).)  The Medicaid

14   Exclusion File was created by the Health Resources and Services Administration pursuant to 42

15   U.S.C. § 1396r-8(a)(5)(C) as the mechanism to assist covered entities under the 340B Program

16   and states in preventing duplicate discounts for drugs subject to Medicaid rebates.  (FAC at ¶ 79.)

17   Plaintiffs also allege that approving Medi-Cal Rx "stands as an obstacle to achieving the purpose"

18   of the 340B Drug Program.  (FAC at ¶ 122(c).)  Plaintiffs' preemption arguments are unavailing.

19   /////

20   _____

21   [17]  Relatedly, plaintiffs' contention that CMS's approval of Medi-Cal Rx was arbitrary or
     capricious because it allegedly requires FQHCs to use their § 330 grants to subsidize Medicaid
22   beneficiaries also lacks merit.  (FAC at ¶¶ 55 & n.8, 122(e).)  In support of this argument,
     plaintiffs appear to rely on a report of the House Budget Committee that accompanied 1989
23   legislation instituting the reimbursement standard for FQHCs from 1989 through 2000.  (*Id.* at ¶
     55 & n.8).  Under that reimbursement standard, "the federal Medicaid program required States to
24   reimburse FQHCs for '100 percent ... of [each FQHC's] costs which are reasonable.'"  *Three
     Lower Ctys. Cmty. Health Servs., Inc.*, 498 F.3d at 297 (quoting 42 U.S.C. § 1396a(a)(13)(C)
25   (repealed 2000)).  The committee report stated that this standard was intended to ensure that §
     330 grant funds were "not used to subsidize health center or program services to Medicaid
26   beneficiaries."  *Id.*  But "Congress amended the Medicaid Act in 2000 to implement a
     new *prospective* payment system based on average historical costs plus a cost-of-living factor."
27   *Id.* at 298.  As has been discussed at some length in this order, there is nothing in Medi-Cal Rx
     preventing an FQHC from receiving the full amount of funds that they are due under the PPS rate.

28

1    In defendant Brooks-LaSure's pending motion, she correctly points out that there is no

2    express preemption clause in § 1396r-8(a)(5)(C).  (Doc. No. 66-1 at 16.)  Rather, that provision

3    concerns the prohibition on states billing manufacturers for Medicaid rebates with respect to

4    drugs dispensed to Medicaid patients that have already been discounted under the 340B Program.

5    *See* 42 U.S.C. § 256b(a)(5)(A).  Specifically, 42 U.S.C. § 1396r-8(a)(5)(C) provides that if the

6    Secretary of Health and Human Services does not establish a mechanism to comply with the

7    prohibition against duplicate discounts "within 12 months of November 4, 1992," then states shall

8    establish such a mechanism subject to certain requirements.  Plaintiffs argue that because the

9    Secretary created the Medicaid Exclusion File in response to § 1396r-8(a)(5)(C)'s mandate to

10   serve as an official data source for determining whether 340B drugs are billed to Medicaid in

11   order to prevent duplicate discounts, it preempted states from creating additional mechanisms to

12   prevent duplicate discount.  (Doc. No. 75 at 17; FAC at ¶ 79.)  However, no express preemption

13   clause appears in the text of § 1396r-8(a)(5)(C) and nothing in that prohibition suggests that states

14   are prohibited from implementing additional requirements or mechanisms to prevent duplicate

15   discounts.  *See* 42 U.S.C. § 1396r-8(a)(5)(C); *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79

16   (1990) (explaining that express preemption occurs "when Congress has made its intent known

17   through explicit statutory language"); *cf. Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148

18   (9th Cir. 2010) (finding that a Medicare provision included an express preemption provision

19   where the statute specifically stated that "[t]he standards established under this part shall

20   supersede any State law or regulation . . .").  Notably, SPA 17-0002, ¶ 7's FFS methodology was

21   adopted to implement the requirements of the federal Covered Outpatient Drug Rule.  In the

22   comments to the final rule CMS actually recognized the states responsibility in preventing

23   duplicate discounts.  *See* 42 C.F.R. §§ 447.512(b)(1), 447.518(a)–(b); Medicaid Program;

24   Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5170 (Feb. 1, 2016) ("State Medicaid Agencies

25   must comply with the requirements of § 447.512(b), § 447.518(a), and § 447.518(d) by submitting

26   a State Plan Amendment (SPA) by June 30, 2017 to be effective no later than April 1, 2017."); *id.*

27   at 5274 (specifically recognizing that "states have flexibility to use a variety of methods to

28   prevent duplicate discounts").  Thus, not only have plaintiffs failed to explain how approval of

Medi-Cal Rx would expressly conflict with the Medical Exclusion File but it appears wholly appropriate under the applicable provisions for the state to be addressing the issue of duplicate discounts on their own.

Plaintiffs' assertion that Medi-Cal Rx "stands as an obstacle to achieving the purpose of the 340B Program," thus implying that Medi-Cal Rx is preempted due to what plaintiffs allege is its conflict with the 340B Program, also fails as a matter of law.  (FAC at ¶ 122(c).)  In this regard, plaintiffs contend that California Welfare & Institutions Code § 14105.46—which includes California's mechanism for preventing duplicate discounts or rebates for 340B drugs in the FFS system[18]—conflicts with the 340B Program.  (FAC at ¶¶ 89–91.)  However, in an unpublished opinion, the Ninth Circuit has found "[t]here is no actual conflict" between § 14105.46 and the "federal statutory law designed to preclude so-called double discounts," 42 U.S.C. § 256b(a)(5)(A), because the two statutes "can both easily be complied with; the state statute surely does not present an obstacle to the prevention of double discounts; and there is no indication that Congress intended to occupy the whole field in this part of the cooperative Medicaid program."  *AIDS Healthcare Found. v. Douglas*, 457 F. App'x 676, 678 (9th Cir. 2011)[19] (affirming the dismissal of the plaintiff's preemption claim on a motion for judgment on the pleadings).

Third, plaintiffs allege that the approval of Medi-Cal Rx, which carves out reimbursement of pharmacy services from managed-care contracts and shifts reimbursement of all Medi-Cal pharmacy services to SPA 17-0002, ¶ 7's FFS methodology, is "contrary to the purpose of Medicaid."  (FAC at ¶¶ 101–105, 122(d).)  As defendant Brooks-LaSure points out, plaintiffs have not presented any legal authority that requires or even authorizes CMS to prohibit states from carving out the reimbursement of pharmacy services from their managed-care system.  (Doc. No. 66-1 at 17.)  Indeed, the Medicaid Act provisions governing contracts between

---

[18]  Subdivision (b) and (d) of California Welfare & Institutions Code § 14105.46 contain the main provisions under SPA 17-0002, ¶ 7 that plaintiffs contend are preempted.

[19]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

managed-care organizations and state Medicaid agencies specifically allows the latter to decide which of its state plan benefits shall fall under managed-care organization contracts and which do not. *See* 42 U.S.C. § 1396b(m)(2)(A); *Clayworth v. Bonta*, 295 F. Supp. 2d 1110, 1114 (E.D. Cal. 2003) ("[B]y way of a waiver from the Secretary of Health and Human Services, states have the alternative of contracting with managed care plans to provide some or all of the covered services in exchange for payment under a prepaid capitation rate or some other risk-based arrangement."), *rev'd on other grounds*, 140 F. App'x 677 (9th Cir. 2005). In addition, reimbursement on an FFS basis, such as that provided for in SPA 17-0002, ¶ 7, is the historical mechanism used for reimbursement of Medicaid providers and, indeed, use of a managed-care model actually requires approval from CMS. *See U.S. ex rel. Englund v. Los Angeles Cnty.*, No. 2:04-cv-00282-LKK-JFM, 2005 WL 2089216, at *1 & n.5 (E.D. Cal. Aug. 30, 2005) (explaining that "Medicaid typically requires eligible health care providers . . . to be paid on a fee-for-service basis" but that the "Secretary of Health and Human Services may waive this requirement," for instance, to allow state "contracts with hospitals that provide services to Medicaid beneficiaries at negotiated per diem rates, plus supplemental payments as needed, in lieu of Medicaid's traditional fee-for-service reimbursement"); Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989, 40,989 (June 12, 2002) ("Before 1982, 99 percent of Medicaid beneficiaries received Medicaid coverage through fee-for-service arrangements. Since 1982, State agencies increasingly have provided Medicaid coverage through contracts with managed care organizations (MCOs) . . . ."). As such, not only is California's decision to carve out pharmacy services from managed-care contracts through Medi-Cal Rx squarely within the state's authority, but CMS's approval of Medi-Cal Rx (which returns pharmacy services reimbursement to an FFS mechanism) is consistent with what the Medicaid Act has historically permitted.

Therefore, the court concludes that plaintiffs have failed to sufficiently allege that CMS's approval of Medi-Cal Rx was arbitrary or capricious by allegedly violating federal laws governing the 340B Program and for being contrary to the purpose of the Medicaid Act. Accordingly, defendant Brooks-LaSure's pending motion to dismiss plaintiffs' third claim will also be granted.

1    **C.    Declaratory Relief (Clam 4)**

2          Plaintiffs' final claim purports to be for declaratory relief against all defendants.  (FAC at

3    ¶¶ 129–133.)  The Declaratory Judgment Act provides that "[i]n a case of actual controversy

4    within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal

5    relations of any interested party seeking such declaration, whether or not further relief is or could

6    be sought."  28 U.S.C. § 2201(a).  "However, declaratory relief is a remedy, not a freestanding

7    cause of action, and Plaintiffs' action for declaratory relief survives only to the extent that

8    Plaintiffs' other causes of action state a claim for relief."  *Darling v. Green*, No. 12-cv-00362-

9    PSG-CW, 2013 WL 12132058, at *9 (C.D. Cal. Apr. 18, 2013); *see also City of Reno v. Netflix,*

10   *Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) ("We agree with our sister circuits that have considered the

11   issue that the Declaratory Judgment Act does not provide an affirmative cause of action where

12   none otherwise exists."); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1097 (N.D. Cal.

13   2022) ("The Declaratory Judgment Act does not provide an independent theory for recovery; if

14   the underlying claims are dismissed, . . . then there is no basis for any declaratory relief.");

15   *Lorona v. Arizona Summit L. Sch., LLC*, 151 F. Supp. 3d 978, 997 (D. Ariz. 2015) ("The Second

16   Amended Complaint lists declaratory and injunctive relief as separate counts. . . . These are

17   remedies, not independent causes of action.").  Accordingly, because the court will dismiss all of

18   plaintiffs' underlying claims, the court will also grant the defendants' motions to dismiss

19   plaintiffs' purported claim for declaratory relief.

20   **D.    Whether Leave to Amend Should Be Granted**

21         "Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend 'should be

22   freely granted when justice so requires,' bearing in mind that 'the underlying purpose of Rule 15 .

23   . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities.'"  *Hadley*

24   *v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1062–63 (N.D. Cal. 2017) (quoting *Lopez v. Smith*,

25   203 F.3d 1122, 1127 (9th Cir. 2000)).  When "dismissing for failure to state a claim under Rule

26   12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading

27   was made, unless it determines that the pleading could not possibly be cured by the allegation of

28   other facts.'"  *Lopez*, 203 F.3d at 1127 (citation omitted).  Moreover, "the district court may

33

1  exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on

2  part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

3  undue prejudice to the opposing party . . . , [and] futility of amendment.'" *Carvalho v. Equifax*

4  *Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182

5  (1962)).

6        Here, plaintiffs requested leave to amend in their opposition brief but did not indicate in

7  what way they would propose to amend their FAC.  (Doc. No. 75 at 20.)  At the hearing on the

8  pending motions, plaintiffs' counsel informed the court that if the undersigned determined that

9  plaintiffs had failed to state cognizable claims based on the facts as alleged in the FAC, then the

10  granting of leave to amend would not be worthwhile.  Plaintiffs' position is that the FAC as pled

11  states cognizable claims for relief and they have no new legal theories or factual allegations that

12  they wish to plead.  As such, because the court has concluded that all of plaintiffs' claims fail to

13  allege a cognizable legal theory, it appears clear that granting leave to amend under these

14  circumstances—and in light of plaintiffs' counsel's comments at the hearing—would be futile.

15  *See AIDS Healthcare Found.*, 457 F. App'x at 678 (finding that the district court's failure to grant

16  leave to amend was not error where the plaintiff failed to indicate how it could successfully

17  amend and the asserted legal claim appeared futile).

18        Therefore, plaintiffs will not be granted leave to file a second amended complaint.

19  **CONCLUSION**

20        For the reasons explained above,

21  1.    The Clerk of the Court to is directed to update the docket to reflect that, as of

22      December 30, 2021, defendant California Department of Health Care Services had

23      been terminated from this action and defendant Michelle Baass had been

24      substituted in for defendant William Lightbourne;

25  2.    Defendant Baass's unopposed request for judicial notice (Doc. No. 61-2) is

26      granted;

27  3.    Defendant Baass's motion to dismiss (Doc. No. 61) is granted without further

28      leave to amend;

34

4.      Defendant Brooks-LaSure's unopposed request for judicial notice (Doc. No. 66-2) is granted;

5.      Defendant Brooks-LaSure's motion to dismiss (Doc. No. 66) is granted without further leave to amend; and

6.      The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Dated:   **July 14, 2023**

_____
UNITED STATES DISTRICT JUDGE